UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

NORTHVILLE DOWNS,
OIL CAPITAL RACE VENTURE, INC., d/b/a
MT. PLEASANT MEADOWS, and GREAT
LAKES QUARTERHORSE ASSOCIATION

       Plaintiffs,

                                      Case No. 08-11858

-vs-                                HON. AVERN COHN

JENNIFER GRANHOLM, Governor of
the State of Michigan, MICHAEL COX
Michigan State Attorney General and
MGM GRAND DETROIT, LLC,

       Defendants.

_____/

## MEMORANDUM AND ORDER GRANTING DEFENDANTS' MOTIONS FOR JUDGMENT ON THE PLEADINGS (DOCS. 15, 19)

### I. Introduction

      This is a constitutional case.  Plaintiffs Northville Downs, Oil Capital Ventures,

Inc. d/b/a Mt. Pleasant Meadows, and Great Lakes Quarterhorse Association

(collectively, plaintiffs) complain that article IV, section 41 of the Michigan Constitution

violates the First Amendment, the dormant Commerce Clause, and the Equal Protection

Clause of the United States Constitution.  Defendants are Governor Jennifer Granholm

and Attorney General Michael Cox, along with intervening defendant MGM Grand

Detroit, L.L.C., a casino (collectively, defendants).

      Before the Court are defendants' motions for judgment on the pleadings under

Fed. R. Civ. P. 12(c) (Doc. 15, 19).   The Court heard oral arguments on February 18,

2009.  For the reasons below, the Court will grant defendants' motions.  Plaintiffs do not have standing to bring a First Amendment claim, and the Commerce Clause and Equal Protection claims lack merit.[1]

## II.  Background

### A.

Plaintiffs spend a good deal of effort describing the competitive relationship of racetracks and casinos vying for gambling dollars spent in Michigan as the precedent for the challenged 2004 amendment to article IV, section 41 of the Michigan Constitution (the challenged amendment).  The conclusions drawn from their description are urged on the Court as an interpretive aid in understanding the thrust of the amendment analogous to the legislative history of a statute.  While the discussion of the history of legalized gambling in Michigan is of interest as deep background as to how the case arose (see Part B below), it has no relevance to the issues with which the Court is dealing.

### B.[2]

_____

[1] In the second amended complaint, plaintiffs abandoned a Due Process claim. The Court has declined to exercise supplemental jurisdiction over plaintiffs' state claims (Doc. 43) and has denied plaintiffs' motion for partial summary judgment without prejudice (Doc. 44).

[2] The Court gleaned the history of legalized gambling in Michigan from the following sources: Rohan v. Detroit Racing Ass'n, 314 Mich. 326, 335 (1946); Mich. Legis. Serv. Bureau, Laws Proposed by Initiative Petition and Submitted to the People, 1964–2005, in Mich. Manual 2005–2006 (Christopher J. Carl ed., 2006), *available at* http://www.legislature.mi.gov/documents/publications/manual/2005-2006/2005-MM-077 5-0777-Petition.pdf; Mich. S. Fiscal Agency, Video Lottery Terminals H.B. 4610 (H-3): Floor Analysis, Apr. 28, 2004, *available at* http://www.legislature.mi.gov/documents/ 2003-2004/billanalysis/Senate/pdf/2003-SFA-4610-F.pdf; John Engler, Mich. Gov., Exec. Order No. 1996-10, Nov. 1996, *available at* http://www.state.mi.us/migov/gov/

**1.**

Horse racing was the first form of legalized gambling in Michigan.  The legislature

established it by the Racing Act of 1933.  Act No. 199, Pub. Acts 1933  (repealed 1959).

Currently horse racing is governed by the Horse Racing Law of 1995.  Act No. 279,

Pub. Acts 1995 (codified at M.C.L. §§ 431.301–431.336).

In 1972 Michigan voters ratified Michigan House Joint Resolution V to remove

---

ExecutiveOrders/1996/1996-10.html; Frank J. Kelly, Mich. Att'y Gen., Op. No. 6648, July 3, 1990, *available at* http://www.ag.state.mi.us/opinion/datafiles/1990s/op06648.htm; Initiative Petitions—Proposed Amendments to the Michigan Constitution [Official Michigan Ballot Wording, November 2004 General Election], *available at* http://www. legislature.mi.gov/(S(tjteue55fsvb2j45qm4fhfuu))/documents/publications/Mpla/2004/09-InitiativePetitions2004.pdf; Julie Koval & David Zin, Mich. S. Fiscal Agency, November 2004 Ballot Proposal 04-1: An Overview, *available at* http://www.senate.michigan.gov/ sfa/Publications/BallotProps/Proposal04-1.pdf; Mich. Nonprofit Assoc. & Council of Mich. Foundations, Casinos and Other Legal Gambling, in Michigan in Brief, 2002–2003, 64, 64–68 (Apr. 1, 2002), *available at* michiganinbrief.org/edition07/Chapter5/ Chapter5_Files/06-Casinos_Gambling.pdf; Mackinac Ctr. for Pub. Policy, Michigan Votes, 2003 House Bill 4610 (Video lottery [slot machines] at racetracks— "racinos"), http://www.michiganvotes.org/2004-HB-4610 (last visited Feb. 19, 2009); Michigan Ballot Measures, 1964–2005, http://ballotpedia.org/wiki/index.php/Michigan_Ballot_ Measures_(1964-2005) (last visited Feb. 19, 2009); Mich. Dept. of State, 2004 Official Michigan General Election Results—State Proposal—04-1: Constitutional Amendment: Voter Approval of Gambling/Lottery Games, Dec. 1, 2004, http://miboecfr.nicusa.com/ election/results/04GEN/90000001.html (last visited Feb. 24, 2009); Mich. Gaming Control Bd. (MGCB), History of Gaming in Michigan, michigan.gov/mgcb/0,1607,7-120-1382_1453-11371--,00.html (last visited Feb. 19, 2009); MGCB, Laws, Rules, & Regulations, http://michigan.gov/mgcb/0,1607,7-120-1382_1450---,00.html (last visited Feb. 19, 2009); MGCB, Overview of Casino Gaming in Michigan, http://www.state.mi. us/mgcb/overview.htm (last visited Feb. 19, 2009); MGCG, Proposal E Ballot Language, http://www.michigan.gov/mgcb/0,1607,7-120-1382_1450-12939--,00.html (last visited Feb. 19, 2009); MGCG, The Michigan Gaming Control Board, http://www.michigan.gov/ mgcb/0,1607,7-120--5946--,00.html (last visited Feb. 19, 2009); Mich. Lottery, Michigan Lottery Through the Years, http://michigan.gov/lottery/0,1607,7-110-29196_29199---,00. html (last visited Feb. 25, 2009);  Michigan Horseracing, Michigan Pari-Mutuel Horseracing—75 Years of History, http://www.michigan.gov/horseracing/0,1607,7-249--182959--,00.html (last visited Feb. 19, 2009); Michigan Proposal E, 1996, http://ballot pedia.org/wiki/index.php/Michigan_Proposal_E_(1996) (last visited Feb. 19, 2009).

the constitutional provision that prohibited the legislature from approving a lottery and amend the Constitution as follows: "The legislature may authorize lotteries and permit the sale of lottery tickets in the manner provided by law."  Mich. Const. art. IV, § 41. The Lottery Act establishing the Michigan State Lottery quickly followed.  Act. No. 239, Pub. Acts 1972 (codified at M.C.L. §§ 432.1–432.47).

Efforts to introduce legalized gaming to Detroit had failed since the 1970s.  But in 1994 a casino opened across the Detroit River in Windsor, Canada, drawing Michigan residents and their money.  In 1996 Michigan voters approved ballot initiative Proposal E, which resulted in enactment of the Michigan Gaming Control and Revenue Act. Initiated Law 1 of 1996 (codified at M.C.L. §§ 432.201–432.226).  The Act establishes the Michigan Gaming Control Board, M.C.L. § 432.204; it permits up to three gaming casinos in any city whose local legislature has enacted an ordinance approving casino gaming and that meets the following qualifications: has a population of 800,000 or more; is located within 100 miles of any other state or country in which gaming is permitted; and has had casino gaming approved by a majority of the voters in the city, §§ 432.202(l), 432.203, 432.206(1)(a), (2), (3).

During the early 2000s, horse racetracks began lobbying the state legislature for approval to install slot machines on their premises.  They were making headway when existing casino interests financed a petition initiative that appeared as Proposal 1 on the 2004 general election ballot.[3]  The voters approved Proposal 1, amending the Michigan

---

[3] The official ballot language read:
PROPOSAL 04-1
A PROPOSAL TO AMEND THE STATE CONSTITUTION TO REQUIRE
VOTER APPROVAL OF ANY FORM OF GAMBLING AUTHORIZED BY

Constitution to read:

> The legislature may authorize lotteries and permit the sale of lottery tickets in the manner provided by law. *No law enacted after January 1, 2004, that authorizes any form of gambling shall be effective, nor after January 1, 2004, shall any new state lottery games utilizing table games or player operated mechanical or electronic devises be established, without the approval of a majority of electors voting in a statewide general election and a majority of electors voting in the township or city where the gambling will take place. This section shall not apply to gaming in up to three casinos in the City of Detroit or to Indian Tribal Gaming.*[4]

---

> LAW AND CERTAIN NEW STATE LOTTERY GAMES
> The proposed constitutional amendment would:
> • Require voter approval of any form of gambling authorized by law after January 1, 2004.
> • Require voter approval of any new state lottery games utilizing "table games" or "player operated mechanical or electronic devices" introduced after January 1, 2004.
> • Provide that when voter approval is required, both statewide voter approval and voter approval in the city or township where gambling will take place must be obtained.
> • Specify that the voter approval requirement does not apply to Indian tribal gaming or gambling in up to three casinos located in the City of Detroit.
>
> Should this proposal be adopted?
> Yes
> No

[4] The exemption for tribal gaming may be gratuitous as Michigan has no authority to regulate gaming on tribal lands. "State regulation of tribal casinos can only occur '[i]f a federal court or agency rules or federal legislation is enacted that allows a state to regulate gambling on Native American land.'" Taxpayers of Mich. Against Casinos v. State, 471 Mich. 306, 321 (2004) (quoting Mich. Comp. Laws § 432.203(5)). Taxpayers gives an overview of Indian-State relationships at id. 319–23.

Under Public Law No. 100-497, the Indian Gaming Regulatory Act passed by Congress in 1988, generally "Indian tribes have the exclusive right to regulate gaming activity on Indian lands if the gaming activity is not specifically prohibited by Federal law and is conducted within a State which does not, as a matter of criminal law and public policy, prohibit such gaming activity." (codified at 25 U.S.C. § 2701(5)). However, Class III gaming, which includes slot machines, must be in conformance with a Tribal-State compact. 25 U.S.C. §§ 2703(6), (7), (8); 2710(d). A compact takes effect only when notice of approval by the Secretary of the Interior is published in the Federal Register. §

Mich. Const. art. 4, § 41 (emphasis added) (amended language in emphasis).  Plaintiffs

say the amended language violates the First Amendment, the Commerce Clause, and

the Equal Protection Clause of the United States Constitution.

**2.**

"In construing our constitution, this Court's object is to give effect to the intent of

the people adopting it."  People v. Bulger, 462 Mich. 495, 507 (2000), *abrogated on*

*other grounds*, Halbert v. Michigan, 545 U.S. 605, 618–24 (2005).  But as the Ninth

Circuit has observed, "the search for the people's intent in passing initiatives is far

different from the attempt to discern legislative intent; there are no legislative hearing

transcripts, committee reports, or other legislative history."  Jones v. Bates, 127 F.3d

839, 860 (9th Cir. 1997).  Nevertheless, as Michigan Chief Justice Thomas M. Cooley

explained more than a century ago,

> in seeking for [the] real meaning [of article 6, section 29 of the Michigan
> Constitution of 1850] we must take into consideration the times and
> circumstances under which the state constitution was formed—the general
> spirit of the times and the prevailing sentiments among the people.  Every
> constitution has a history of its own which is likely to be more or less
> peculiar; and unless interpreted in the light of this history is liable to be
> made to express purposes which were never within the minds of the
> people in agreeing to it.  This the court must keep in mind when called
> upon to interpret it; for their duty is to enforce the law which the people
> have made, and not some other law which the words of the constitution
> may possibly be made to express.

People v. Harding, 53 Mich. 481, 485 (1884); see Durant v. State, 456 Mich. 175,

192–96 (1977) (applying Chief Justice Cooley's reasoning to the interpretation of article

---

2710(d)(3)(B); see also § 2710(d)(8).  The State must negotiate in good faith.  §
2710(d)(3)(A).  These requirements bind anyone with authority to act on behalf of the
State with regard to Indian gaming matters, including the Governor.  Michigan began
entering into Tribal-State compacts in 1993.  None of the compacts is at issue here.

IX, section 29 of the Michigan Constitution); see also Recent Case, 122 Harv. L. Rev. 4,

1263, 1266, 1270 (2009) (criticizing the Michigan Supreme Court for failing to inquire

into the history and "the prevailing sentiments of the people" when interpreting article I,

section 25 of the Michigan Constitution in Nat'l Pride at Work, Inc. v. Governor, 481

Mich. 56 (2008)).  Further, "[a] constitutional provision must be presumed to have been

framed and adopted in the light and understanding of prior and existing laws and with

reference to them."  Bacon v. Kent-Ottawa Metro. Water Auth., 354 Mich. 159, 171

(1958) (internal quotation marks omitted) (quoting Council of Saginaw v. Bd. of

Trustees, 321 Mich. 641, 647 (1948) and 11 Am. Jur. § 63).

While the casinos may have financed the petition effort to place the proposal for

the challenged amendment on the ballot, it cannot be said that the intent of the voters in

adopting the proposal was necessarily what the casinos intended.  The election results

for the proposal were 2,689,448 in favor and 1,926,721 against.  Plaintiffs would like the

Court to find a common view of what was intended in adopting the amendment, that is,

giving the three Detroit casinos an effective monopoly on gambling.  But the proponents

of the challenged amendment were "an unlikely combination of *anti-gambling interests*,

Detroit casino owners and Indian tribe-owned casinos."  Alejandro Bodipo-Memba, Prop

1 Boils Down to Money; Questions and Answers on Issue, Detroit Free Press, Oct. 27,

2004, at 1B (emphasis added).  Many who voted for it could be said to have wanted to

restrict gambling.

### III.  Legal Standard

The Court reviews a motion for judgment on the pleadings under Fed. R. Civ. P.

12(c)  "using the same standard as applies to a review of a motion under Rule 12(b)(6)."

J.P. Morgan Chase Bank v. Winget, 510 F.3d 577, 581 (6th Cir. 2007).  To survive a motion to dismiss under Rule 12(b)(6), a "'complaint must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under some viable legal theory.'"  Advocacy Org. for Patients & Providers v. Auto Club Ins. Ass'n, 176 F.3d 315, 319 (6th Cir. 1999)  (quoting Scheid v. Fanny Farmer Candy Shops, Inc., 859 F.2d 434, 436 (6th Cir. 1988)).  "[W]e do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, ___, 127 S. Ct. 1955, 1974 (2007).

The Court will grant a judgment on the pleadings only if the moving party is clearly entitled to judgment when "all well-pleaded material allegations of the opposing party [are] taken as true."  Winget, 510 F.3d at 581–82.  Even when the allegations are taken as true, however, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  Twombly, 550 U.S. at ___, 127 S. Ct. at 1964–65; Sensations, Inc. v. City of Grand Rapids, 526 F.3d 291, 295 (6th Cir. 2008) (quoting Twombly).  The facts alleged must state a claim that is plausible rather than merely creating a suspicion of a legally cognizable right.  Bishop v. Lucent Techs., Inc., 520 F.3d 516, 519 (6th Cir. 2008).

### IV.  Analysis

### A.  First Amendment

Plaintiffs have no standing to pursue a First Amendment claim.

It is true that "constitutional violations may arise from the deterrent, or 'chilling,' effect of governmental regulations that fall short of a direct prohibition against the

8

exercise of First Amendment rights."  Laird v. Tatum, 408 U.S. 1, 11 (1972).

Nevertheless,  "[a]llegations of a subjective 'chill' are not an adequate substitute for a

claim of specific present objective harm or a threat of specific future harm."  Id. at

13–14.  There is no justiciable injury where it was merely a plaintiff's "own subjective

apprehension [that] counseled him to choose caution."  Morrison v. Bd. of Educ., 521

F.3d 602, 610 (6th Cir. 2008).

    In Morrison, a high school student believed he had a religious duty to inform

fellow students that homosexual behavior is a sin.  Id. at 605.  His school had a policy

against a student's making insulting comments about another student's sexual

orientation.  Id.  Fearing punishment if he spoke out, Morrison kept silent—and sued

instead.  Id.  The Sixth Circuit held that Morrison did not have standing to raise a First

Amendment challenge to the school board's policy because he chilled his own speech

based on an assumption, without any specific action by the school, that he would be

punished if he spoke out.  Id. at 610.  "Absent a concrete act on the part of the Board,

Morrison's allegations fall squarely within the ambit of 'subjective chill' that the Supreme

Court definitively rejected for standing purposes."  Id. (quoting Laird, 408 U.S. at 13).

Moreover, even where an authoritative body has taken concrete action, a plaintiff will

lack standing to assert a facial challenge to a law if he "fail[s] to demonstrate actual

present harm or a significant possibility of future harm."  Fieger v. Mich. Sup. Ct.,553

F.3d 955, 957, 974 (6th Cir. 2009) (plaintiffs had no standing to challenge MRPC 3.5(c)

and 6.5(a) in spite of a stipulated reprimand by the Michigan Supreme Court for

disrespectful speech directed toward a state tribunal).

    Plaintiffs have far less reason to argue for standing than the unsuccessful

plaintiffs in Fieger and Morrison.  In contrast to Fieger, they have pointed to no sanction

for their speech.  In contrast to Morrison, they have pointed to no law or policy against

speech they would like to make.  Plaintiffs say, however, that the challenged

amendment places them at a competitive disadvantage that violates their right to

petition the legislature for redress of grievances and thereby chills their exercise of First

Amendment rights.  Further, they say they are intimidated by past experience from

contesting another ballot proposal.  These arguments lack merit.  And contrary to

plaintiffs' assertion that their case is like Lac Vieux Desert Band of Lake Superior

Chippewa Indians v. Mich. Gaming Control Bd., 172 F.3d 397 (6th Cir. 1999), there are

significant differences.

        In Lac Vieux, a Detroit city ordinance gave preference in the bidding process for

three casino licenses to developers who had previously "propos[ed] a casino gaming

proposal . . . and actively promoted and significantly supported the State initiative

authorizing gaming."  Id. at 401 (internal quotation marks omitted) (quoting Detroit City

Code § 18-13-1).  The Sixth Circuit held that Detroit's ordinance was analogous to the

"unbridled licensing scheme" in City of Lakewood v. Plain Dealer Publ'g Co., 486 U.S.

750 (1988), and

>        does create a substantial risk that parties will self-censor, thereby chilling
>        speech. In this case the "chilling effect" arises because the statute limits
>        the ability of persons or entities to take a particular political position freely,
>        whether that position may be to support or to oppose a particular proposal
>        or to remain neutral, without fear of being burdened in a subsequent
>        bidding process for having supported the wrong side, or even for having
>        supported no side of the given issue.  The Court found in Plain Dealer that
>        a facial attack is appropriate and a plaintiff need not actually participate in
>        the licensing or selection process when this type of chilling effect arises.
>
>        Furthermore, the city ordinance does "give[] a government official

10

or agency substantial power to discriminate based on the content or viewpoint of speech by suppressing disfavored speech or disliked speakers." Pursuant to the ordinance, the Mayor and the City Counsel [sic] must grant a preference to certain entities because those entities took a particular view on a political issue. *These officials not only have the "power" to discriminate based on the viewpoint of political speech, they are required to do so by law.*

We conclude that the principle established in Plain Dealer in the context of licensing laws, that a facial challenge should lie when a "law gives a government official or agency substantial power to discriminate based on the content or viewpoint of speech by suppressing disfavored speech or disliked speakers" also applies in this context, where the statute grants a preference to certain entities because they took a particular view on a particular political issue. Therefore, a facial challenge is appropriate in this case, and the fact that Lac Vieux did not actually participate in the competitive bidding process is not an obstacle to establishing standing.

In addition, prudential concerns also dictate that the court should hold that Lac Vieux has standing to bring a facial First Amendment challenge to the city ordinance. *This legislation would award lucrative contracts pursuant to a statute that explicitly provides preferences to entities that provided political support for that statute.* Were we to affirm the decision below without granting standing and addressing the merits, it is likely that no other party would have standing to challenge the ordinance, and the decision below could be interpreted to stand for the proposition that this type of legislation is constitutional.

Id. at 407–08 (both emphases added) (quoting Plain Dealer, 486 U.S. at 759).

Unlike the ordinance in Lac Vieux, the challenged amendment is not analogous to a licensing scheme and does not reward (or punish) particular political viewpoints. The amendment restricts the expansion of gaming in Michigan by requiring approval by voters statewide and locally wherever the expansion would occur, and exempts up to three Detroit casinos and tribal gaming. Plaintiffs point to nothing in the challenged amendment that speaks to viewpoint—political or otherwise, past, present, or future—nor can they.

Further, the challenged amendment does not chill plaintiffs' right to petition. The

11

voter approval requirement of the amendment follows legislative action.  Plaintiffs had

and continue to have access to the political system through petition to the state

legislature.  Plaintiffs also have direct access to the voters through initiating a ballot

proposal with a petition drive, as did the proponents of the challenged amendment.

Indeed, at the very time casino interests were exercising their political rights by

promoting the challenged amendment through ballot initiative, plaintiffs were exercising

their own rights by promoting a legislative bill to allow video lottery terminals in

racetracks.

Finally, plaintiffs' argument that they have been "punished for engaging in

political speech opposing [the ballot proposal]" is at best creative.  At most, they could

try to argue that they are being punished for not *being* an Indian tribe or one of three

Detroit casinos.  But even this argument would get them nowhere on a First

Amendment claim for it goes to existence and the nature of the thing,[5] not viewpoint.

Plaintiffs have produced no evidence of punitive intent based on political speech before,

during, or after the campaigns for and against the ballot proposal.  The voters were not

punishing plaintiffs.  They simply voted differently on this issue than plaintiffs would

have liked.

Plainly put, plaintiffs lost at the polls.  But they live to fight another day if they so

choose.  That one or more plaintiffs choose instead to chill their exercise of the right to

petition because, based on their perceptions of the costly uphill political battle before

them, their "own subjective apprehension counsel[s] [them] to choose caution,"

_____

[5] This is one reason plaintiffs do have standing to bring claims under the
Commerce and Equal Protection Clauses, <u>infra</u>.

Morrison, 521 F.3d at 610, is "not an adequate substitute for a claim of specific present

objective harm or a threat of specific future harm," Laird, 408 U.S. at 13–14.

### B.  Commerce Clause

Plaintiffs' Commerce Clause claim lacks merit.

The "dormant" Commerce Clause is implicated whenever a state discriminates in

favor of in-state actors at the expense of out-of-state competitors at the same level.

See, e.g., Baldwin v. G.A.F. Seelig, Inc., 294 U.S. 511, 522 (1935) ("'It is the

established doctrine of this court that a state may not, in any form or under any guise,

directly burden the prosecution of interstate business.'  Nice distinctions have been

made at times between direct and indirect burdens.  They are irrelevant when the

avowed purpose of the obstruction, as well as its necessary tendency, is to suppress or

mitigate the consequences of competition between the states." (quoting Int'l Textbook

Co. v. Pigg, 217 U.S. 91, 112 (1910))).  To overcome the presumptive invalidity of a

facially discriminatory law, a defendant must show a legitimate local purpose and an

absence of any non-discriminatory alternative to the restriction.  Dean Milk Co. v. City of

Madison, 340 U.S. 349, 354 (1951).  If the law does not discriminate on its face but

> regulates evenhandedly to effectuate a legitimate local public interest, and
> its effects on interstate commerce are only incidental, it will be upheld
> unless the burden imposed on such commerce is clearly excessive in
> relation to the putative local benefits. . . .  If a legitimate local purpose is
> found, then the question becomes one of degree.  And the extent of the
> burden that will be tolerated will of course depend on the nature of the
> local interest involved, and on whether it could be promoted as well with a
> lesser impact on interstate activities.

Pike v. Bruce Church, Inc., 397 U.S. 137, 142 (1970).

Plaintiffs point to the challenged amendment's exception for up to three Detroit

13

casinos and tribal gaming.  They cite Gulch Gaming, Inc. v. South Dakota, 781 F. Supp.

621 (D.S.D. 1991).  The statute overturned by the district court in Gulch Gaming

required gaming licensees to be majority-owned by South Dakota residents.  Id. at 628.

By contrast, the challenged amendment makes no distinction whatsoever—facially, in

purpose, or in effect—between in-state and out-of-state actors.  In fact, with regard to

the entities covered by the exemption, in the matter of tribal gaming the Indian tribes are

closer to sovereign nations than they are Michigan residents[6] and the amendment does

not prescribe that the "up to three [Detroit] casinos" be Michigan companies or majority-

owned by Michigan residents.[7]  Further, the effect of the amendment is the same on all

other entities, in-state and out-of-state alike: they must get voter approval for any

gaming expansion.

Plaintiffs claim the challenged amendment fails to "regulate evenhandedly to

effectuate a legitimate local public interest and the burden imposed on interstate

commerce is clearly excessive in relation to its putative local benefits."  They point to

the fact that they derive over 90% of their revenue from interstate simulcast of horse

racing, a federally regulated activity.  They say the exemptions of tribal gaming and the

Detroit casinos have allowed expansion of those entities to the diminishment of

plaintiffs' revenue that is derived almost exclusively from interstate commerce.  They

cite a study showing that for every thousand new slot machines added to the Detroit

casinos, Northville Downs' gross "handle" has decreased by five percent (5%).  They

---

[6] See supra n. 4; Nevada v. Hicks, 533 U.S. 353, 361 (2001).

[7] In fact, one of the three present Detroit casinos, intervening defendant MGM Grand Detroit, is a Delaware limited liability company.

14

also cite the Attorney General's data that indicate that 1,769 machines have been added to the market since passage of the challenged amendment.

What the in-state plaintiffs[8] fail to proffer, however, is any evidence that their own decreased revenues amount to any burden—"clearly excessive," "incidental," or otherwise—on interstate commerce. They have not linked the fact that their revenues are derived largely from interstate commerce to *anything* concerning out-of-state competitors at the same level of the casinos, let alone to the interstate discrimination with which the dormant Commerce Clause is concerned. And even if the Michigan plaintiffs had somehow been able to show a connection between their decreased revenues and discrimination in favor of Michigan residents, the Court would likely have found any burden on interstate commerce to be incidental to the legitimate purpose of regulating gambling in Michigan.

## C. Equal Protection

Although, relatively speaking, the Equal Protection claim may be plaintiffs' strongest, it too must fail.

> [E]qual protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices. In areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.

F.C.C. v. Beach Commc'ns, Inc., 508 U.S. 307, 313 (1993).

The reasoning in Beach Communications applies as well to voter-approved ballot

---

[8] Plaintiff Northville Downs is a Michigan co-partnership, plaintiff Oil Capital Race Venture, Inc., is a Michigan domestic profit corporation, and plaintiff Great Lakes Quarterhorse Association is a Michigan non-profit corporation.

15

initiatives like Proposal 1 that gave rise to the challenged amendment.

Plaintiffs say the challenged amendment creates two classes of gaming licensees: those who must run the gauntlet of statewide and local elections and those who are exempted from the requirement.  They compare their case to Shapiro v. Thompson, 394 U.S. 618, 627 (1969), overruled in part by Edelman v. Jordan, 415 U.S. 651, 670–71 (1974), in which the Supreme Court struck down state statutes denying welfare assistance to persons who did not meet one-year residency requirements.  In oral argument, plaintiffs made much over what they dubbed the "political restructuring" in Hunter v. Erickson, 393 U.S. 385, 387, 393 (1969), in which the Supreme Court invalidated an amendment to the Akron, Ohio, city charter that required voter approval of any enacted ordinance regulating real property transactions on the basis of race, color, religion, national origin, or ancestry.  But the statutes in Shapiro drew strict scrutiny from the high court because they dealt with the fundamental right of travel between states, and the amendment in Hunter, because it targeted constitutionally suspect classes.

In contrast to Shapiro and Hunter, this case does not involve a fundamental right such as travel or marriage, nor a fundamental interest such as voting or access to the courts, a First Amendment right, or a suspect class such as race or nationality.  Nor does it involve even a quasi-suspect class such as sex.

Nevertheless, plaintiffs ask the Court to use what they style the "heightened scrutiny" of City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432 (1985), and Romer v. Evans, 517 U.S. 620 (1996).  In Cleburne, a Texas municipal zoning ordinance required special permits for group homes for the mentally retarded.  473 U.S. at 435.  The

16

Supreme Court held that, while the mentally retarded do not qualify for quasi-suspect classification, even under a lesser standard the ordinance was invalid as applied by the city. Id. "The short of it is that requiring the permit in this case appears to us to rest on *an irrational prejudice* against the mentally retarded." Id. at 450 (emphasis added). In Romer, Colorado voters passed a state constitutional amendment prohibiting "all legislative, executive, or judicial action at any level of state or local government designed to protect . . . homosexual persons." 517 U.S. at 624. To this the Supreme Court said, "[W]e cannot accept the view that [the amendment's] prohibition on specific legal protections does no more than deprive homosexuals of special rights. To the contrary, the amendment *imposes a special disability upon those persons alone*. Homosexuals are forbidden the safeguards that others enjoy or may seek without constraint." Id. at 631 (emphasis added).

Unlike Cleburne and Romer, this case involves nothing close to an irrational prejudice against the mentally retarded or a voter-created disability imposed on homosexuals that would call for adding bite to the rational basis test. And, contrary to plaintiffs' assertion, protectionism like that in Craigmiles v. Giles, 312 F.3d 220 (6th Cir. 2002), does not exist here. The Tennessee statute struck down by the Sixth Circuit in Craigmiles prohibited the sale of caskets by anyone other than a state-licensed funeral director. Id. at 229. In contrast, the challenged amendment does not prohibit expansion of gaming in the state by anyone; it merely sets the parameters for how that expansion may occur. The amendment does not single out the Michigan horse racing industry in its desires to add slot machines to racetracks. To the contrary, the amendment would apply to any business that wanted to install slot machines as well as to any interest that

17

would like to establish a new form of gambling in the state, say, dog racing.

What is involved here are simply competing gaming interests along with an apparent desire on the part of Michigan voters to control expansion of legalized gambling within the state.  The Sixth Circuit has held that a district court may not inquire into the electorate's motivations in an equal protection context absent a facially racially discriminatory referendum or one where the only possible rationale is racial.  Arthur v. City of Toledo, 782 F.2d 565, 574 (6th Cir. 1986).  But cf. Buckeye Cmty. Hope Found. v. City of Cuyahoga Falls, 263 F.3d 627, 638 n.2 (6th Cir. 2001), rev'd on other grounds, 538 U.S. 188 (2003) (criticizing Arthur for being so stringent that the invalidation of an initiative that forbade busing for desegregation purposes by Washington v. Seattle Sch. Dist. No. 1, 458 U.S. 457 (1982), the Supreme Court case on which Arthur relied, would have failed its test); Coalition to Defend Affirmative Action v. Regents of the Univ. of Mich., 539 F. Supp. 2d 924, 950 (E.D. Mich. 2008) (exploring why discerning voter intent is difficult).

Although here we are dealing not with a referendum but with a ballot initiative, Arthur's stricture holds—especially because no suspect class or even quasi-suspect class or irrational fear or prejudice is involved.  And if the Court were to try to look at voter intent, it would start by noting once again that the proponents of the challenged amendment were "an unlikely combination of anti-gambling interests, Detroit casino owners and Indian tribe-owned casinos."  Bodipo-Memba, supra.

The Court therefore reviews the Equal Protection claim by asking if the challenged amendment has (1) a legitimate end and (2) rationally related means.  The answer to both questions is yes.

18

Michigan, like any state, has a legitimate government interest in regulating the gaming industry.  As the Eighth Circuit observed in <u>Hawkeye Commodity Promotions, Inc. v. Vilsack</u>, "[t]he regulation of gambling—including its expansion and contraction—is a significant and legitimate public purpose."  486 F.3d 430, 439 (8th Cir. 2007).  The Eleventh and Fourth Circuits have held that gambling regulation lies at the "heart of the state's police power."  <u>Gulfstream Park Racing Ass'n v. Tampa Bay Downs, Inc.</u>, 399 F.3d 1276, 1278 (11th Cir. 2005); <u>Johnson v. Collins Entm't Co., Inc.</u>, 199 F.3d 710, 720 (4th Cir.1999).  "Formulations of that power underscore the state's paramount interest in the health, welfare, safety, and morals of its citizens. The regulation of lotteries, betting, poker, and other games of chance touch all of the above aspects of the quality of life of state citizens."  <u>Johnson</u>, 199 F.3d at 720.

To effect gaming regulation, Michigan's voters used a means that is rationally related to the purpose: expansion of gambling may proceed only with statewide and local approval of the voters.  That the voters who approved the challenged amendment chose to balance the restriction by exempting Indian tribes over whom they have no authority anyway and up to three casinos in what is arguably the most economically depressed city in the United States, only enhances the rational basis of the means.

19

**V. Conclusion**

For all of the foregoing reasons, the Court GRANTS defendants' motions for

judgment on the pleadings.  This case is DISMISSED.

SO ORDERED.


_S/Avern Cohn_____
AVERN COHN
UNITED STATES DISTRICT JUDGE


Dated:  February 25, 2009


I hereby certify that a copy of the foregoing document was mailed to the attorneys of
record on this date, February 25, 2009, by electronic and/or ordinary mail.


_S/Julie Owens_____
Case Manager, (313) 234-5160